UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TREVOR L. SMITH,<br><br>                Plaintiff,<br><br>        v.<br><br>PAUL COUNTS; SCOTT BENNETT; ERIC HOLMLUND; JASON BOYCE; COUNT ON US LLC; and SMILING LLAMA PRODUCTIONS LLC,<br><br>                Defendants. | No. 2:20-cv-02441-TLN-JDP<br><br>**ORDER** |

This matter is before the Court on Plaintiff Trevor L. Smith's ("Plaintiff") Motion to Proceed *in Forma Pauperis* and *Ex Parte* Motion for a Temporary Restraining Order ("TRO") against Defendants Paul Counts ("Counts"), Scott Bennett ("Bennett"), Eric Holmlund ("Holmlund"), Jason Boyce ("Boyce"), Count on Us LLC, and Smiling Llama Productions LLC (collectively, "Defendants"). (ECF Nos. 2–3.) For the reasons set forth below, both of Plaintiff's motions are GRANTED.

///

///

///

///

### I.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff seeks damages and injunctive relief for alleged copyright infringement arising from "the development, production, and post-production of a motion picture called Unbelievers . . . which was written, produced, and directed by Plaintiff and filmed in and around Sacramento, California." (ECF No. 1 at ¶ 12.) Plaintiff wrote the novel *Unbelievers* ("Novel") in 2012, which was published in 2013 and copyrighted under the number TXu001849048. (*Id.* at ¶ 21.) Plaintiff subsequently wrote the screenplay for *Unbelievers* ("Screenplay") based on the Novel and copyrighted it under the number Pau003975095. (*Id.* at ¶ 22.) Plaintiff has been the executive producer and producer for the Unbelievers motion picture ("Film") since its inception, and Plaintiff's wife Kristi Smith ("Kristi") became the second producer in 2013. (*Id.* at ¶¶ 23–24.) In May 2014, Plaintiff met Counts's wife, Kristen Counts ("Kristen"), and the following month Kristen suggested that Plaintiff contact Counts for assistance with the Film. (*Id.* at ¶¶ 25–26.) Plaintiff then invited Kristen to be a producer and Counts to be an executive producer and producer. (*Id.* at ¶ 27.) Plaintiff is the sole copyright claimant for the pre-registration[1] of the Film, under the number PRE000010799. (*Id.* at ¶ 12.)

Plaintiff met Counts for the first time in or around December 2014, when Counts and Kristen flew to Sacramento to work with Plaintiff on a teaser for the Film. (*Id.* at ¶ 28.) In September 2015, Plaintiff authorized Counts "to start Unbelievers Movie, LLC ('UM LLC') . . . fully understanding and agreeing that UM LLC was to be a temporary company in Washington [State] and Plaintiff would start the official [Unbelievers] movie company in California." (*Id.* at ¶ 29.) Thereafter, Plaintiff alleges UM LLC was registered in Washington State as a temporary company in order to satisfy the Screen Actors' Guild ("SAG") requirements and for banking purposes only.[2] (*Id.* at ¶¶ 20, 29, 31.) Plaintiff further alleges UM LLC was collectively owned and managed by Plaintiff, Kristi, Kristen, and Counts. (*Id.* at ¶ 30.) Plaintiff

---

[1]   The U.S. Copyright Office allows for preregistration of "works that have had a history of prerelease infringement. It focuses on the infringement of movies, recorded music, and other copyrighted materials before copyright owners have had the opportunity to market fully their products." *See* Preregister Your Work, U.S. COPYRIGHT OFFICE, available at https://www.copyright.gov/prereg/ (last visited Dec. 13, 2020).

[2]   UM LLC is not a party to this suit.

1 authorized Counts to draft the UM LLC Operating Agreement, which all managers signed. (*Id.* at
2 ¶ 32.) Plaintiff also authorized Counts to submit the SAG paperwork, which Counts signed in or
3 around October 2015 and swore under penalty of perjury that Plaintiff, Kristi, Kristen, and Counts
4 were all managers of UM LLC. (*Id.* at ¶¶ 32–34.) The UM LLC Operating Agreement
5 "evidences that no money, goods, services, property, intellectual property, or anything of value
6 was contributed to or promised to UM LLC by Plaintiff or any of its members." (*Id.* at ¶ 35.)
7 Plaintiff authorized Counts to open an agreed-upon bank account for UM LLC in Washington
8 State in accordance with the UM LLC Operating Agreement. (*Id.* at ¶ 36.) Plaintiff further
9 alleges Counts "was fully aware and in agreement that the UM LLC bank account would be a
10 temporary account" until Plaintiff opened the official bank account in California. (*Id.*)

11 Plaintiff alleges Counts and Bennett[3] filed a civil suit in or around January or February
12 2017 "that contained blatant and knowingly false claims against Plaintiff." (*Id.* at ¶ 37.) Counts
13 and Bennett posted the civil suit online and "emailed the unverified complaint to [the
14 Unbelievers] cast and crew, causing swift and immediate severe and irreparable harm to
15 Plaintiff's reputation, business, creative projects, physical and mental well-being and the well-
16 being of Plaintiff's family." (*Id.* at ¶ 38.) During the litigation of this civil suit, Plaintiff alleges
17 Defendants were "unlawfully editing" the Film and attempting to sell it, despite Plaintiff's cease
18 and desist demands and assurance from Counts and Bennett's attorney that neither of them would
19 violate Plaintiff's legal rights to the Film. (*Id.* at ¶ 39.)

20 Plaintiff alleges Counts and Bennett voluntarily dismissed the suit in or around June 2019,
21 the day after Plaintiff informed Counts and Bennett's attorney that he "intended to file a counter
22 lawsuit" against them. (*Id.* at ¶ 40.) On or around October 11, 2019, Plaintiff filed suit against
23 Counts, Bennett, and others with the Eastern District of California. (*Id.* at ¶ 41.) However,
24 Plaintiff subsequently dismissed this suit on or around July 27, 2020, based on his "shared
25 religious beliefs" with Counts and Bennett, believing they could resolve the matter out of court.

26

27 [3] Plaintiff does not introduce Bennett prior to this reference in his Complaint's statement of facts, nor does Plaintiff provide further information as to who Bennett is or how Bennett is related
28 to Plaintiff or Counts.

(*Id.* at ¶ 42.)

Plaintiff alleges Defendants have "continued to edit, display and try to sell [Unbelievers]," "[w]ithout legal right, Plaintiff's consent, and against Plaintiff's repeated demands to Defendants to cease and desist." (*Id.* at ¶ 43.) On or around November 4, 2020, a Film cast member informed Plaintiff of a December 2020 release date for the Film listed on the Internet Movie Database ("IMDB"). (*Id.* at ¶ 44.) On or around November 6, 2020, Plaintiff called and left voicemails for Counts and Bennett, in addition to sending them emails. (*Id.* at ¶ 45.) Plaintiff asked to discuss "how [they] could possibly move forward together, and advised them again that Defendants have no legal rights to work on or distribute [the Film]." (*Id.*) Plaintiff also notified them legal action would be taken if they attempted to release the Film, but he received no response. (*Id.*) On or around the same day, Counts, Bennett, Holmlund, Lago, and Kristen were listed as producers on IMDB. (*Id.* at ¶ 46.)

Plaintiff called Counts and Bennett and sent emails to them again on or around December 4, 2020, to ask about the December 16, 2020 release date for the Film. (*Id.* at ¶ 47.) Plaintiff notified Defendants that if he did not receive a response from them before Monday, December 7, 2020, then "Plaintiff would be forced to file a lawsuit against them." (*Id.*) Neither Counts, Bennett, nor Holmlund responded to Plaintiff. (*Id.*)

Plaintiff alleges "Defendants have unlawfully altered and used Plaintiff's [Novel] and [Screenplay], and backup copies of Plaintiff's [Unbelievers] raw film footage to illegally create, display, and market [the Film], set to be distributed and publicly released on December 16, 2020." (*Id.* at ¶ 48.) Plaintiff further alleges "Defendants intended to commit fraud against Plaintiff to profit from the [Film] they had and have no legal right to edit, sell or distribute." (*Id.* at ¶ 49.)

On December 9, 2020, Plaintiff filed a Complaint in this Court, alleging six claims for: (1) copyright infringement; (2) contributory copyright infringement; (3) fraud; (4) breach of fiduciary duty; (5) injunctive relief to restrain Defendants from sharing, displaying, and distributing the Film; and (6) accounting of Defendants' financial records pertaining to the Film. (*See* ECF No. 1.) On the same date, Plaintiff filed the instant Motions to Proceed *in Forma Pauperis* and for a TRO. (ECF Nos. 2–3.)

4

**II.     STANDARD OF LAW**

A TRO is an extraordinary remedy.  The purpose of a TRO is to preserve the status quo pending a fuller hearing.  *See* Fed. R. Civ. P. 65.  In general, "[t]emporary restraining orders are governed by the same standard applicable to preliminary injunctions." *Aiello v. One West Bank*, No. 2:10-cv-0227-GEB-EFB, 2010 WL 406092, at *1 (E.D. Cal. Jan. 29, 2010) (internal citations omitted); *see also* E.D. Cal. L.R. 231(a).

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Costa Mesa City Emps. Ass'n v. City of Costa Mesa*, 209 Cal. App. 4th 298, 305 (2012) ("The purpose of such an order is to preserve the status quo until a final determination following a trial."); *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy.").

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  A plaintiff must "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *All. for the Wild Rockies v. Cottrell (Alliance)*, 632 F.3d 1127, 1135 (9th Cir. 2011).  In evaluating a plaintiff's motion for preliminary injunction, a district court may weigh the plaintiff's showings on the *Winter* elements using a sliding-scale approach. *Id.*  A stronger showing on the balance of the hardships may support issuing a preliminary injunction even where the plaintiff shows that there are "serious questions on the merits . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.*  Simply put, a plaintiff must demonstrate, "that [if] serious questions going to the merits were raised [then] the balance of hardships [must] tip[ ] sharply" in the plaintiff's favor

in order to succeed in a request for preliminary injunction. *Id*. at 1134–35.

**III.  ANALYSIS**

The Court first evaluates Plaintiff's motion to proceed *in forma pauperis* (ECF No. 2) and will then consider each of the *Winter* elements with respect to Plaintiff's motion for a TRO (ECF No. 3).

### A.  Plaintiff's Motion to Proceed *in Forma Pauperis*

Plaintiff has filed a separate motion to proceed *in forma pauperis*. (ECF No. 2.) The Court has carefully reviewed the documentation provided by Plaintiff and finds that Plaintiff's application makes the showing required by 28 U.S.C. § 1915(a)(1). Accordingly, Plaintiff's Motion to Proceed *in Forma Pauperis* is hereby GRANTED.

### B.  Likelihood of Success on the Merits

Plaintiff argues in his motion for a TRO that he "can demonstrate a strong likelihood of success on the merits of his claim." (ECF No. 3 at 3.) While mindful of the fact that Defendants have not had the opportunity to submit argument in opposition to Plaintiff's motion for a TRO, the Court nevertheless agrees that Plaintiff has sufficiently established a likelihood of success on the merits as to most of his claims at this time.

#### *i.  Copyright Infringement*

To present a prima facie case for copyright infringement, a plaintiff must (1) show ownership of the allegedly infringed material, and (2) demonstrate that the alleged infringer violated at least one exclusive right granted to copyright holders under 17 U.S.C. § 106. *A&M Records, Inc. v. Napster, Inc. (A&M Records, Inc.)*, 239 F.3d 1004, 1013 (9th Cir. 2001) (citing 17 U.S.C. § 501(a)). The Copyright Act grants the following six exclusive rights to copyright holders:

> (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based on the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial,

>graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106.

Plaintiff alleges Defendants "are fully aware that they do not have legal rights or consent from Plaintiff to produce, display, sell or distribute" the Film, and Defendants edited the Film "while being demanded by Plaintiff to cease and desist." (ECF No. 1 ¶ 61.) Specifically, Plaintiff alleges he is the registered copyright owner of the Novel and Screenplay registered with the U.S. Copyright Office, as well as the sole copyright claimant of the Film. (*Id.* at ¶¶ 51–52.) Plaintiff has not "licensed, sold, granted, traded or transferred his copyrights or controlling rights to Defendants." (*Id.* at ¶ 53.) Plaintiff has an exclusive right "to produce and prepare derivatives of his copyrighted works and to exclusively display his copyrighted works publicly." (*Id.* at ¶ 54.)

Plaintiff's allegations relating to his copyright infringement claim state Defendants infringed his Novel, Screenplay, and Film by editing and selling the Film, as well as airing the first two minutes of the Film. Plaintiff alleges Counts and Bennett "wrote publicly in and around [October] 2018 and [December] 2018, that they were editing and trying to sell [Unbelievers]," and the parties were in litigation at this time. (*Id.* at ¶ 55.) Upon learning this information, Plaintiff demanded Defendants cease and desist these actions, "which they willfully ignored." (*Id.* at ¶ 56.) Plaintiff further alleges in or around July 2019, "Defendants unlawfully completed an unauthorized edit of the [Film]," and on or around July 7, 2019, Counts "publicly broadcast the first two minutes of the unauthorized completed [Film] Defendants created without legal rights or Plaintiff's consent." (*Id.* at ¶¶ 57–58.)

Plaintiff alleges Defendants changed the story and screenplay "to produce and publicly display" film footage "that was humiliating to Plaintiff and a terrible reflection of the brand of written and visual story telling that Plaintiff has worked to develop and become known for over the past 15 years." (*Id.* at ¶ 59.) Further, the Film clip Defendants broadcasted "heartbreakingly revealed the biggest twist in Plaintiffs' entire [Film]." (*Id.*) Counts stated publicly on social

7

1  media on or around July 8, 2019: "I am super thankful and proud of the work our editors did on
2  the final cut of our SAG Feature film, Unbelievers." (*Id.* at ¶ 60.)  Boyce stated to Plaintiff on or
3  around September 15, 2019: "The editors we found finished the film in less than a year . . ." (*Id.*
4  at ¶ 62.)

5  As noted previously, Plaintiff alleges ownership of his copyrights in his Complaint and
6  provides the respective copyright numbers for the Novel, the Screenplay, and the Film.  (*See*
7  *generally* ECF No. 1.)  As Plaintiff has adequately alleged ownership of his copyrights, he has the
8  exclusive right to use such copyrights.  Any use by Defendants would thus be fraudulent and in
9  violation of the Copyright Act.  Therefore, Plaintiff has shown a likelihood of success on the
10 merits of his copyright infringement claim.

         *ii.*   *Contributory Copyright Infringement*

12 "[W]hile the Copyright Act does not expressly impose liability on anyone other than
13 direct copyright infringers, courts have long recognized that in certain circumstances, vicarious
14 or contributory liability will be imposed." *In re Napster, Inc. Copyright Litigation*, 377 F. Supp.
15 2d 796, 801 (N.D. Cal. May 31, 2005) (citing *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d
16 259, 261 (9th Cir. 1996)).  Specifically, the doctrine of contributory infringement "imposes
17 liability where one person 'knowingly contributes to the infringing conduct of another.'" *Id.*
18 (quoting *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir.
19 1971)).  "The elements of contributory infringement are: (1) direct infringement by a third party;
20 (2) actual or constructive knowledge by the defendant that third parties were directly infringing;
21 and (3) a material contribution by the defendant to the infringing activities." *Id.* (citing *A&M*
22 *Records, Inc.*, 239 F.3d at 1013 n.2, 1019–22).

23 Here, Plaintiff alleges "Defendants induced, caused and materially contributed to the
24 infringing acts of others by encouraging and inducing others to edit, produce, share and
25 distribute unauthorized [Unbelievers] content derived from Plaintiff's copyrighted [Unbelievers]
26 works." (ECF No. 1 at ¶¶ 71, 73.)  Plaintiff suggests third parties were infringing on his
27 copyright at the direction of Defendants by alleging "Defendants continued to edit, display and
28 try to sell [the Film]," and "a cast member for [the Film] informed Plaintiff that there was a

1   [December] 2020 release date for [the Film] listed on [IMDB]." (*Id.* at ¶¶ 43–44.) Plaintiff
2   further alleges "Defendants had knowledge of the infringing acts relating to Plaintiff's
3   copyrighted works, and . . . Defendants' injurious acts have been willful and intentional, . . . and
4   were a substantial factor in having caused and continuing to cause Plaintiff damage and harm."
5   (*Id.* at ¶ 75.)

As Plaintiff has adequately alleged ownership of his copyrights, he has also shown a likelihood of success on the merits of his claims for contributory copyright infringement.

### iii.   Fraud

Under California law, the elements of fraud are: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th 85, 93 (2001). Federal courts will apply state law to determine whether the elements of fraud have been pled adequately to state a cause of action, but Federal Rule of Civil Procedure ("Rule") 9(b) requires that the circumstances establishing fraud must be stated with sufficient particularity. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). Specifically, Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The allegations underlying a fraud claim must be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge." *Vess*, 317 F.3d at 1106 (internal quotation marks omitted). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Id.* (citing *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). "[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Id.* (citing *Decker v. GlenFed, Inc.*, 42 F.3d 1541, 1548 (9th Cir. 1994)).

First, Plaintiff alleges Counts "secretly opened an unauthorized bank account in the name of UM LLC" while he "represented to Plaintiff and UM LLC members that the agreed upon UM LLC bank account was opened and being used in accordance with the UM LLC Operating

Agreement." (ECF No. 1 at ¶¶ 79–80.) Plaintiff further alleges Counts signed a document and swore under penalty of perjury to SAG "that Plaintiff, Kristi, Kristen, and [Counts] are the managers of UM LLC" and "notarized and <u>declared under penalty of perjury</u> in a letter to Facebook, more than once, that he was <u>one</u> of the managing members of UM LLC and that Plaintiff was a managing member of UM LLC." (*Id.* at ¶ 86 (emphasis in original).) Yet Plaintiff notes attorneys for Counts, Bennett, and non-parties Matthew R. Dardenne and John Cardot "knowingly and falsely <u>declared under penalty of perjury</u> to the Sacramento Superior Court, 'Since its inception, Counts has been and remains the sole manager of UM LLC.'" (*Id.* at ¶ 87 (emphasis in original).) These allegations identify the purported misrepresentations with sufficient clarity and particularity to satisfy the first element of Plaintiff's fraud claim.

However, the Court finds the remainder of the elements required to plead fraud are merely conclusory statements couched as factual allegations. With respect to the second element, Plaintiff alleges Counts's representation "was knowingly false," but does not identify whether it is the representation that he was opening a bank account in accordance with the UM LLC Operating Agreement or the representation he made to the court that he was the sole manager of UM LLC. (*Id.* at ¶ 80.) With respect to the third element, Plaintiff alleges Defendants have "fraudulently represent[ed] that UM LLC owns [Unbelievers] and that Defendants have secured the rights from Plaintiff to market and sell the [Film], which is blatantly and knowingly false." (*Id.* at ¶ 82.) With respect to the fourth element, "Plaintiff reasonably and justifiably relied upon and trusted [Counts] to fill out, file, and submit paperwork concerning the Washington[-]based UM LLC and [Unbelievers] as agreed and instructed by Plaintiff." (*Id.* at ¶ 83.) Plaintiff does not specifically identify how he "reasonably and justifiably relied upon" Counts. Finally, with respect to the fifth element, Plaintiff alleges "[a]s a direct result of Defendants' intentional and injurious actions and fraudulent misrepresentations, Defendants have caused and continue to cause severe and irreparable harm to Plaintiff in an amount to be proven at trial." (*Id.* at ¶ 88.)

Accordingly, the Court finds there are no serious questions raised as to the merits of Plaintiff's fraud claim. However, this alone is not dispositive as to Plaintiff's motion for a TRO, as the Court finds Plaintiff raises serious questions as to the merits of his other claims.

          *iv.*       *Breach of Fiduciary Duty*

"In order to plead a claim for breach of fiduciary duty, the claimant must allege (1) the existence of a fiduciary relationship giving rise to a fiduciary duty, (2) breach of that duty, and (3) damage proximately caused by the breach." *Migliaccio v. Midland Nat. Life Ins. Co.*, No. CV 06-1007 CASMANX, 2007 WL 316873, at * 10 (C.D. Cal. Jan. 30, 2007) (citing *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101 (1990)). Whether a fiduciary relationship exists is a question of fact. *Id.* (citing *Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1575–76 (1994)).

First, "a fiduciary relationship is any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party." *Wolf v. Superior Court*, 107 Cal. App. 4th 25, 29 (2003) (internal quotations omitted). "Traditional examples of fiduciary relationships in the commercial context include trustee/beneficiary, directors and majority shareholders of a corporation, business partners, joint adventurers, and agent/principal." *Id.* at 30. Here, Plaintiff alleges he and Counts had an understanding that Counts would start UM LLC and establish the agreed-upon UM LLC bank account on a temporary basis only, and that UM LLC "owned nothing," as Plaintiff would eventually "start and open the official Unbelievers Movie LLC and UM LLC bank account in California." (ECF No. 1 at ¶¶ 91–93.) Plaintiff states he "trusted and justifiably relied upon [Counts] to abide by the UM LLC Operating Agreement that [Counts] drafted and all managers signed in agreement to abide by." (*Id.* at ¶ 94.) Based on the foregoing, the Court finds that Plaintiff has established a fiduciary relationship as business partners between himself and Counts.

Second, Plaintiff alleges Counts breached his fiduciary duty by, among other things: "intentionally failing to comply with the terms of the UM LLC Operating Agreement he drafted," "wrongfully removing Plaintiff from UM LLC," commingling "UM LLC funds with his own, against his representations and in direct violation of the UM LLC Operating Agreement," "wrongfully remov[ing] Plaintiff and Kristi from UM LLC," "secretly open[ing] an unauthorized UM LLC bank account," and "offering unauthorized ownership to 'investors' in [Unbelievers]." (*Id.* at ¶¶ 95–99.) Plaintiff clarifies that neither he nor any of the other the UM LLC owners or managers gave Counts permission to open a UM LLC bank account in any manner that was

1  inconsistent with the UM LLC Operating Agreement.  (*See id.* at ¶ 104.)   Accordingly, the Court

2  finds that Plaintiff has established a breach of the fiduciary relationship.

3  Third, Plaintiff alleges "[a]s a direct result of [Counts's] deliberate, injurious, and self-

4  serving actions, Plaintiff has been and continues to be severely and irreparably harmed in an

5  amount to be proven at trial."  (*Id.* at ¶ 106.)  Plaintiff seeks both "general and compensatory

6  damages," as well as "exemplary and punitive damages" with respect to this claim.  (*Id.* at ¶ 123.)

7  Plaintiff has not specifically pleaded the exact damages he has suffered, but suggests monetary

8  damages stemming from Counts's commingling UM LLC funds with his own, opening an

9  unauthorized UM LLC bank account, and offering investment opportunities.  Accordingly, the

10 Court finds Plaintiff has established damages.

11 As Plaintiff has adequately alleged the existence of a fiduciary relationship, as well as

12 Defendants' breach and subsequent damages, Plaintiff has shown a likelihood of success on the

13 merits of this claim.

14                *v.*       *Accounting*

15 "A cause of action for an accounting requires a showing that a relationship exists between

16 the plaintiff and defendant that requires an accounting, and that some balance is due the plaintiff

17 that can only be ascertained by an accounting."  *Teselle v. McLoughlin*, 173 Cal. App. 4th 156,

18 179 (2009).  Here, Plaintiff alleges there is a copyright owner-infringer relationship giving rise to

19 a claim for damages and injunctive relief.  (*See generally* ECF No. 1); *cf. Hinson v. Cavalry*

20 *Records, Inc.*, 2018 WL 3740540, at *6 (E.D. Cal. Aug. 3, 2018).  Thus, Plaintiff has sufficiently

21 raised serious questions as to the merits of this claim.

22         C.  <u>Irreparable Harm</u>

23 The Court finds Plaintiff has adequately demonstrated a likelihood of imminent and

24 irreparable harm absent injunctive relief.  Specifically, Plaintiff argues Defendants have already

25 caused him, his family, his reputation, his brand, and his intellectual property irreparable harm

26 "by broadcasting video footage from the [Film] showing the images and likeness of locations and

27 individuals who have not given legal consent to be in the [Film], <u>including minors</u>."  (ECF No. 3

28 at ¶ 36 (emphasis in original).)  Plaintiff clarifies "[t]hese individuals have not signed release of

liability forms granting irrevocable rights to their image, likeness, or locations in the [Film]," and thus Defendants' actions expose all parties who made the Film to liability. (*Id.* at 16.) Plaintiff and "others" have been caused irreparable harm by Defendants "showing individuals and locations in the [Film] who have stated as early as [March] 2017 that they refused to be associated with this [Film]." (*Id.* at ¶ 37.) Plaintiff also notes "Defendants completed and broadcast the first two minutes of [the Film], heartbreakingly revealing the biggest twist [he] wrote in [his] story, screenplay, and [Film]." (*Id.* at ¶ 34.)

Plaintiff suggests future immediate and irreparable harm, as "Defendants are willingly and recklessly exposing Plaintiff, Defendants, potential distributors, and all involved in the making of the [Film], to lawsuits." (*Id.* at ¶ 37.) Plaintiff notes "Defendants have and continue to devalue and destroy [his] protected copyrighted intellectual property and brand by horrifically changing and rewording [his] Unbelievers story and screenplay to unlawfully create an unauthorized Unbelievers movie that is simply awful." (ECF No. 3 at 15.) Plaintiff also notes "every unauthorized social media post, image, and video" created and shared by Defendants "further destroy[s] the value of [Plaintiff's] copyrighted work, [his] brand, [his] creative influence, and [his] worth." (*Id.*) Plaintiff maintains Defendants do not have the same "high quality standards" he has built and for which he has been known for the past 15 years. (*Id.* at 15–16.)

Given the foregoing, the Court finds that Defendant has sufficiently shown a likelihood of irreparable harm in the absence of a TRO.

### D.  Balance of Equities

Having found there are serious questions going to the merits of Plaintiff's claims and a likelihood of irreparable harm absent an injunction, Plaintiff must demonstrate the balance of hardships tips sharply in his favor. *See Alliance*, 632 F.3d at 1134–35. A court balancing the equities will look to possible harm that could befall either party. *See CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009), *aff'd*, 348 Fed. App'x. 288 (9th Cir. 2009). Here, Plaintiff notes "Defendants are not likely to suffer any damages beyond possible inconvenience if the TRO is granted." (ECF No. 3 at 20.) Based on the record currently before the Court, Plaintiff has established that all legal rights to Unbelievers belong to Plaintiff, not

1   Defendants.  In response to this Order, however, if Defendants establish any legal rights to the
2   Film, the possible harm to them in temporarily restraining the release of the Film could include
3   lost profits and preparing for the Film's release again.  By contrast, without injunctive relief,
4   "Plaintiff will continue to suffer great injury as long as Defendants are able to freely exploit
5   Plaintiff's [c]opyrighted sources material in spite of Defendants having no ownership or
6   controlling rights over the Unbelievers source material."  (*Id.* at 22.)  Most importantly, Plaintiff
7   argues "[m]ere monetary damages will not be able to compensate Plaintiff if Defendants are not
8   immediately prohibited" from releasing the Film.  (*Id.*)  For these reasons, the Court finds the
9   balance of equities sufficiently tips in Plaintiff's favor.

###            E.   Public Interest

The Court finds the public interest element is neutral.  "The public interest analysis for the issuance of a preliminary injunction requires [the Court] to consider whether there exists [s]ome critical public interest that would be injured by the grant of preliminary relief."  *Credit Bureau Connection, Inc. v. Pardini*, 726 F. Supp. 2d 1107, 1123 (E.D. Cal. Jul. 12, 2010) (citing *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009)).  Plaintiff does not suggest, nor does the Court find, the public's interest would be affected by whether the Court grants or denies injunctive relief.

###            F.   Procedural Deficiencies

There are procedural grounds that may support the Court's denial of Plaintiff's motion.  Eastern District of California Local Rule 231(c) requires other documents to be filed in conjunction with a motion for a TRO, including proposed orders and bond information — documents Plaintiff has failed to submit.  However, *pro se* pleadings can be liberally construed.  *See Haines v. Kerner*, 404 U.S. 519, 520 – 21 (1972); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988); *cf. Expose v. Fay Servicing, Inc.*, 2019 WL 4640556 (E.D. Cal. Sept. 24, 2019) (as plaintiff is proceeding *pro se*, the court can overlook some, but not all, procedural defects).  Moreover, the Court finds Plaintiff has substantially complied with all of the other requirements of Local Rule 231(c) — namely, Plaintiff has attempted to notify Defendants of his intention to pursue legal action if he did not receive a response on the anticipated release

date of the Film and Plaintiff has submitted an affidavit outlining the substantial injury that would befall him in the absence of a TRO.  (*See* ECF No. 3 at 5–13, 16–17.)

Lastly, the Court waives the discretionary bond requirement set forth in Rule 65.  *See Governing Council of Pinoleville Indian Community v. Mendocino Cnty.*, 684 F. Supp. 1042, 1047 (N.D. Cal. 1988) (citing *People of California v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985)) ("[C]ourts have discretion to excuse the bond requirement . . ."). The Court has concluded there is no realistic likelihood of harm to Defendants from prohibiting them from releasing Plaintiff's Film.  *See Jorgensen v. Cassiday*, 320 F. 3d 906, 919 (9th Cir. 2003) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.").  Furthermore, the Court finds waiver of the bond requirement is appropriate here because Plaintiff has sufficiently demonstrated a likelihood of success on the merits of his claim.  *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1116 (C.D. Cal. 2007) ("A bond may not be required, or may be minimal, when the harm to the enjoined party is slight or where the movant has demonstrated a likelihood of success.").  Accordingly, the Court waives the bond requirement.

### IV. CONCLUSION

Plaintiff's *Ex Parte* Motion for a TRO is GRANTED with respect to Plaintiff's request to temporarily enjoin Defendants and all of their officers, agents, servants, employees, attorneys, and all persons under their direction and control, from any and all attempts to edit, market, promote, broadcast, upload, sell, distribute, update the public, advertise or share, any and all content related to Plaintiff's copyrighted Unbelievers novel, screenplay, or motion picture. Defendants are temporarily enjoined from posting any and all content online or shared privately or publicly in violation of Plaintiff's Unbelievers registered copyrights.

Defendants are ordered to show cause in writing no later than December 28, 2020, as to why Defendants and all of their officers, agents, employees, attorneys, and all persons under their direction and control, should not be restrained and enjoined and why a preliminary injunction should not issue.  Plaintiff may file and serve a reply not later than January 4, 2021.  In order to permit the recently-served Defendants an opportunity to review and respond to Plaintiff's Motion,

the Court finds good cause to exercise its discretion to extend the expiration deadline of the TRO. Fed. R. Civ. P. 65(b)(2). Accordingly, the TRO shall remain in effect for 28 days, or until an order on Plaintiff's request for preliminary injunction issues, whichever is sooner.

Pursuant to Local Rule 231(c)(8) and Federal Rule of Civil Procedure 65(b), any party affected by this Order shall have the right to apply to the Court for modification or dissolution of this Order on two (2) days' notice or such shorter notice as the Court may allow. No bond shall be required.

IT IS SO ORDERED.

DATED: December 14, 2020

Troy L. Nunley
United States District Judge